1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   VERNON LEE BELTON,

11             Petitioner,                    No. 2:11-cv-3365 CKD P

12        vs.

13   CONNIE GIPSON[1],

14             Respondent.                    ORDER

15   _____/

16             Petitioner, a state prisoner, is proceeding pro se with a petition for writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2009 conviction for first degree

18   burglary, attempted sodomy, assault with intent to commit sodomy, two counts of forcible rape,

19   and related enhancements, for which he was sentenced to an indeterminate term of 25 years to

20   life plus a consecutive determinate term of 21 years, four months.  (Dkt. No. 1 ("Ptn.") at 1; Dkt.

21   No. 13-1 (state court opinion) at 2-3.)  Respondent has filed an answer to the petition, and

22   petitioner has filed a traverse.  (Dkt. Nos. 13, 24.) The parties have consented to this court's

23   jurisdiction.  (Dkt. Nos. 7, 9.)  Upon careful consideration of the record and the applicable law,

24   the undersigned will deny the petition.

25   _____

26        [1]  See Dkt. No. 28.

## BACKGROUND

In its affirmation of the judgment on appeal, the California Court of Appeal, Third Appellate District, provided the following factual summary of the events resulting in petitioner's conviction:

> Late at night in September 2003, J.W. and her boyfriend C.T. were drinking Hennessy, smoking marijuana, and watching cartoons at their apartment in North Sacramento. C.T. "sold drugs and shot dice" as a means of generating income and occasionally sold drugs out of the apartment. After watching cartoons, C.T. and J.W. had unprotected sex in their bedroom. A short time later, C.T. answered a knock at the front door and told J.W. that he was going to the mini-mart to get a Swisher cigar and not to close the front door because the lock was broken. J.W. remained in bed and fell asleep.
>
> She awoke about 30 minutes later to loud rustling noises coming from inside the apartment. By the time she opened her eyes, defendant and two other men were standing over her bed. Defendant was armed with a handgun, wore a black ski mask that covered his nose and mouth, and had dreadlocks. He grabbed J.W., who remained unclothed, and threw her on the ground, demanding: "Where's the money at, bitch?" J.W. responded that she did not have any money, prompting defendant to strike her in the head with the handgun and insist: "I'm not playing with you. Where's the money at?" Bleeding from the head, J.W. curled up in the fetal position and told defendant that she had $100 in a skirt that was in the closet. One of the other men took the money from the skirt and said: "I got the money. Let's go." Defendant's accomplices then left the bedroom and continued to ransack the apartment.
>
> Defendant remained in the bedroom and sexually assaulted J.W. He first tried to sodomized her. When that was unsuccessful, he flipped J.W. onto her back and raped her, penetrating her vagina with his penis several times over the course of three to four minutes. The assault came to an end when the other men returned to the bedroom and told defendant several times: "[C.T.] is coming. [C.T.] is coming." Defendant then "finished," pulled up his pants, and went to the bathroom before leaving the apartment. J.W. believed that defendant used a condom during the assault, but also heard a "pop" sound, which she believed to be the condom breaking.
>
> While defendant and the other robbers were still inside the apartment, C.T. was outside enlisting the assistance of his neighbor, J.J. He told J.J. that some-thing strange was going on at his apartment and that he needed to find a gun. J.J. then walked to

a corner of the apartment complex with a clear view of the apartment and saw a young African-American man leaving the apartment.  This man had dreadlocks and was holding a handgun.  Deciding to patrol the neighborhood, J.J. went back to his house to get his truck.  As he pulled out of the apartment complex gate, he saw the same man, accompanied by several others, in a car pulling out of another nearby apartment complex.  J.J. followed in pursuit, chasing the car down Howe Avenue at a high rate of speed.  When the pursued vehicle turned onto Auburn Boulevard, it lost control and crashed into a fence.  J.J. then drove back to the apartment complex to pick up C.T.

Meanwhile, J.W. came out of the apartment and told C.T. what happened.  She then went to his mother's apartment across the street to call 911.  At this point, J.J. drove C.T. to the crash site, dropped him off, and then found a police officer to flag down.  By the time the police officer arrived at the crashed vehicle, the occupants had fled the scene.

J.W. was taken to UC Davis Medical Center, where a sexual assault examination was performed. Back at her apartment, police collected a used and torn condom that was discovered on the bathroom floor.  Police also collected evidence from the crashed vehicle, which was a rental car that had been rented to Kenneth Hill, defendant's former cell mate.  Hill and defendant were released from jail about two weeks prior to the home invasion robbery and sexual assault.

Defendant was not identified as a suspect until April 2006.  Shortly thereafter, J.W. picked defendant out of a photo line-up, stating: "Probably [defendant], but I'm not positive. I'm basing that on his eyes because I never saw the lower half of his face.  His eyes were real small and kind of almond shaped.  [Defendant] looks like the guy who sexually assaulted me."  Police then questioned defendant and obtained a sample of his DNA.  Defendant admitted to having sex with J.W., but claimed that he met her at the mini-mart and that she invited him into the apartment to smoke marijuana.  According to defendant, after they smoked the marijuana they had consensual sex, at which point three men broke into the apartment and started to hit defendant, prompting him to flee from the apartment.

Defendant's DNA was a match for that collected from semen samples taken from J.W.'s anal and vaginal areas.  Defendant's DNA was also a match for that collected from the torn condom found on the bathroom floor.  Defendant's DNA also matched that collected from a cigarette, a red hat, and a white t-shirt found in the crashed vehicle.

People v. Belton, 2011 WL 2571312, **1-2 (Cal. App. 3 Dist., June 30, 2011).

\\\\\

On September 21, 2009, following a trial in the Sacramento County Superior Court, a jury found petitioner guilty on the following counts: first-degree residential burglary (count 1; Cal. Penal Code § 459[2]), first-degree robbery (count 2; § 211), attempted sodomy count 3; (§§ 664/286(c)(2); assault with intent to commit sodomy (count 4; § 220); and rape (counts 5 and 6; § 261(a)(2)).  (Lod Doc. 1 at 450-55, 458-63[3].)  The jury also found that petitioner personally used a firearm during the commission of the offenses in counts 1 and 2 (count 1; §§ 1203.06(a)(1)/12022.5(a)(1); count 2, §12022.53(b)).  The jury also found that petitioner committed the offenses in counts 3, 5, and 6 during the commission of a burglary and personally used a firearm (§ 667.61(e)(2), (e)(4)).

On November 20, 2009, the court sentenced petitioner to an aggregate term of twenty-five years to life, plus twenty-one years and four months, in state prison.  (Ptn. at 1; Lod. Doc. 1 at 538-41.)

Petitioner appealed the judgment to the Court of Appeal for the Third Appellate District, which affirmed the judgment in a reasoned opinion on June 30, 2011.  (Lod. Docs. 5-7; Dkt. No. 13-1.)  Petitioner then filed a petition for review in the California Supreme Court.  (Lod. Doc. 8.)  On October 12, 2011, the California Supreme Court denied the petition "without prejudice to any relief which . . . [petitioner] might be entitled after this court decides People v. McCullough, S192513."  (Lod. Doc. 8.)[4]

Petitioner commenced the instant action on December 19, 2011.  (Ptn.) Respondent filed an answer to the petition (Dkt. No. 13), and petitioner filed a traverse (Dkt. No. 24).

---

[2] Unless otherwise designated, all statutory references are to the California Penal Code.

[3] Lodged Documents refer to those documents lodged by respondent on March 22, 2012. (Dkt. No. 14.)

[4] McCullough concerns a defendant's obligation to pay jail booking fees pursuant to state law.  (Lod. Doc. No. 9.)

ANALYSIS

I. AEDPA

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).  Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal

law.'" Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Accordingly, "a habeas court must determine what arguments or theories supported or . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.

1   Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

2   court's ruling on the claim being presented in federal court was so lacking in justification that

3   there was an error well understood and comprehended in existing law beyond any possibility for

4   fairminded disagreement."  Harrington, supra, 131 S.Ct. at 786-787.  Clearly established" law is

5   law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van

6   Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will

7   not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006)

8   (established law not permitting state sponsored practices to inject bias into a criminal proceeding

9   by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed

10   guards does not qualify as clearly established law when spectators' conduct is the alleged cause

11   of bias injection).  The established Supreme Court authority reviewed must be a pronouncement

12   on constitutional principles, or other controlling federal law, as opposed to a pronouncement of

13   statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

14         The state courts need not have cited to federal authority, or even have indicated

15   awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8. Where the

16   state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

17   federal court will independently review the record in adjudication of that issue.  "Independent

18   review of the record is not de novo review of the constitutional issue, but rather, the only method

19   by which we can determine whether a silent state court decision is objectively unreasonable."

20   Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

21         "When a state court rejects a federal claim without expressly addressing that

22   claim, a federal habeas court must presume that the federal claim was adjudicated on the merits –

23   but that presumption can in some limited circumstances be rebutted."  Johnson v. Williams, No.

24   11-465, slip op. at 10, 568 U.S. ____ (Feb. 20, 2013).  "When the evidence leads very clearly to

25   the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles

26   the prisoner to" de novo review of the claim.  Id., slip op. at 13.

II. Petitioner's Claims[5]

A. Dismissal of Jurors

1. Claim

   Petitioner alleges that the trial court "acted without good cause and in violation of his rights to a unanimous and impartial jury" and his constitutional right to a fair trial when the court dismissed two jurors during deliberations. (Ptn. at 24.[6])  Petitioner contends that "the trial court improperly continued questioning and pressuring Jurors [Nos.] 6 and 12 after they had assured the court they were presently willing and able to deliberate." (Id. at 27.)

   Addressing petitioner's claim on appeal in the last reasoned decision on this issue, the Court of Appeal for the Third Appellate District set forth the relevant facts as follows:

> After two full days of deliberations, the jury sent the trial court a note advising that they were unable to reach a decision.  In response, the trial court sent the jury a questionnaire asking with respect to each count: (1) the number of votes taken; (2) when the last vote was taken; and (3) the numerical breakdown of the jury on its first and last vote.  The jury responded that it had taken a single vote that morning, and that the numerical breakdown was six-five-one as to each count.
>
> When the foreperson returned the questionnaire, she advised the bailiff of her concern that three of the jurors were "trying to rush through everything" and were not "taking their obligation seriously."  The trial court then questioned the foreperson, who explained that Juror No. 12 "seemed biased" because she stated, " 'not guilty' " when she first entered the deliberation room. The foreperson also explained that this juror, a high school biology teacher, "seem[ed] to be in a hurry and wanting to get this trial over with," repeatedly commenting that she "stays up until 11:00 at night [correcting paperwork] and then has to be back at the high school at 6:30 in the morning to drop off the paperwork."  The foreperson also complained that Juror No. 6 asked the other jurors whether they were being paid for their jury service.  When several

---

[5] In addition to the claims discussed below, petitioner claims that the trial court erred in imposing booking, classification, and crime prevention program fees on petitioner.  This claim is not cognizable on federal habeas review.  Additionally, as set forth in its May 22, 2012 order, the court disregards petitioner's unintentional and unexhausted claims for ineffective assistance of counsel, construing them as drafting errors such that the petition is not "mixed." (Dkt. No. 26.)

[6] Page citations refer to those number assigned by the court's docketing system.

jurors answered that they were being paid, he responded that it was "not fair," and that he did not seek to be excused for economic hardship because "he wanted to see what it was like" to be on a jury.  FN1

FN1. The foreperson also complained that Juror No. 5 appeared to be texting on his cell phone and had also fallen asleep during deliberations.  When the trial court questioned this juror, he explained that he had been sick over the weekend, and the medication he took that morning made him "kind of groggy."  He denied texting on his cell phone.  He also stated that he felt "much better" and promised to fully participate in deliberations from that point forward. The trial court did not remove him from the jury.

The trial court then questioned Juror No. 6.  When asked whether he was being paid by his employer for his jury service, the juror responded that he was not.  And when asked whether that created a hardship, the juror responded: "Kind of, yes, since it has been going on for so long.  If it continues, it will."  The trial court then asked how he supported himself without this source of income. The juror answered: "I get help from whoever I can."  When asked whether he was thinking about how he was going to pay his bills, the juror responded: "Well, right now I don't have too many bills to pay, but, kind of, yeah."

The following exchange then took place: "[Trial court:] So if you were to-if the jury were to need to deliberate for another week-you kind of put your teeth together. [] [Juror No. 6:] Yeah. [] [Trial court:] I have to mark things on the record. [] [Juror No. 6:] Yeah, it is kind of inconvenient.  But if I'm needed, I guess I can do it. [] [Trial court:] Well, could you promise us that you can continue to deliberate without thinking about 'I want to hurry and get this over with?['][] [Juror No. 6:] Umm. A hundred-percent truthfully, no, probably not."  The trial court then asked: "Can you promise us not to think about when will this be over, meaning deliberations, if I were to send you back into the jury deliberation room?"  The juror answered: "No, I can't."

The trial court also questioned Juror No. 12.  The juror confirmed that she had been staying up late correcting papers and getting up early to return them to the high school before returning to the court to continue deliberations.  She denied making any statement that she wanted to "get this over with."  She also stated that she was committed to participating in deliberations, discussing the evidence with the other jurors, and allowing each juror to participate in deliberations "[r]egardless of how long it takes."  The trial court decided not to remove Juror No. 12 from the jury.

The trial court then called Juror No. 6 back into the courtroom and asked two questions in order to "make sure" that continued participation would not result in a hardship.  First, the trial court

asked:  "Can you focus on the evidence regardless of how long jury deliberations take?"  He responded: "No."  Second, the trial court asked: "Can you put aside your concern regarding the time it is taking and your not getting paid and your bills and focus just on the evidence?"  He responded: "No, ma'am."  Defense counsel objected to the removal of this juror, but candidly stated: "I think those were clear answers, unfortunately."  The trial court then removed Juror No. 6 from the jury, replaced him with an alternate, and instructed the jury that deliberations must begin anew.

The jury deliberated for the remainder of the day.  That night, Juror No. 12 left a voicemail for the trial judge asking to be removed as a juror. She explained in a "tired" voice: "[H]aving just arrived home now at 8:20, I want to see if it is still possible to be excused. [] Going into class, going through the paperwork, notes from my substitute, I am losing my sub next week.  He's been a long-term biology sub, but I will no longer have him, and that will be a hardship to my students, really, more than me. I can go the nighttime, but with losing him, it is going to be more difficult for the 156 students I have in my class. [] Anyways, I am not a quitter, but I was thinking if this goes another week or two, then it is going to be really detrimental."

The next day of trial, the trial court again questioned Juror No. 12.  After explaining to the juror that it had "no idea" how long deliberations would take, the trial court asked whether she knew about the extra work she would be doing for her students when she was initially questioned during voir dire.  The juror responded that she knew she would be required to make lesson plans for her substitute, but explained that she was fortunate to have had a substitute with a biology major for the previous three weeks. However, now she was going to lose this substitute, and would be required to devise lesson plans "as if the person knows nothing about biology."

The trial court then asked whether, given the current situation, she would be able to concentrate on the evidence and fully participate in the deliberations with the other jurors.  The juror provided an equivocal response, stating, "[o]f course I could," but also explaining that it would cause her "a lot of stress and pressure" and "would be very, very difficult."  The trial court then explained that the juror needed to be clear: "[I]f you say, 'It's going to be difficult, but I will do it,' then my obligation under the law is to leave you on this jury.  If you say, 'I am not a quitter.  I know it's going to be difficult, but given the situation, I'm not going to be able to concentrate. I am going to be thinking about when it's going to be over because of the duty I have to my students,' then the law would provide differently."  The juror then unequivocally stated that she would not be able to concentrate and deliberate as a juror.  She then broke into tears and said: "I'm not a quitter. I don't want to not be here. I'm trying to-I thought I could at one time, but ... I've got

three kids of my own and I have no clean laundry.  It's just so many things.  So I'm trying to-I want to do the best for everything and I'm not doing well with anything.

The trial court removed Juror No. 12 and replaced her with an alternate.  The jury was again instructed to begin deliberations anew.  The jury reached a verdict after roughly seven hours of deliberations.

2011 WL 2571312, **3-5.

2. State Court Decision

Addressing the merits of petitioner's claim, the state court of appeal reasoned[7]:

Penal Code section 1089 provides the trial court with authority to discharge a juror who, upon good cause shown, is found to be unable to perform his or her duty. FN2   Because a juror possesses a duty to deliberate (see People v. Cleveland (2001) 25 Cal.4th 466, 485), a finding of financial or personal hardship that would cause the juror to feel pressure to bring deliberations to a speedy close renders the juror unable to perform his or her duty and thus subject to discharge and substitution under section 1089.  (People v. Earp (1999) 20 Cal.4th 826, 892-893 (Earp); People v. Lucas (1995) 12 Cal.4th 415, 489 (Lucas); see also People v. Fudge (1994) 7 Cal.4th 1075, 1099-1100 (Fudge).)

FN2. Undesignated section references are to the Penal Code.

We review the trial court's decision to discharge a juror under the deferential abuse of discretion standard, and will uphold the decision unless it falls outside the bounds of reason. [Citations.] "The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, ' "does not offend constitutional proscriptions." ' [Citation.]" [Citations.]

 However, in order to protect a defendant's constitutional rights to due process and to a fair trial, "a juror's inability to perform as a juror must be shown as a 'demonstrable reality.' " [Citations.]

In Lucas, supra, 12 Cal.4th 415, our Supreme Court upheld the discharge of a juror prior to penalty phase deliberations in a capital murder trial where it "seemed likely the penalty trial would require the juror to cancel her vacation." (Id. at p. 487.)  Even though the

---

[7]  Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801–806 (1991); Van Lynn v. Farmon, 347 F.3d 735 (9th Cir. 2003).

juror stated that this would "not impact her deliberation," the trial court relied on her "demeanor and distress" and the fact that she brought up the problem of losing her vacation several times. (Id. at pp. 487-488.) Finding no abuse of discretion, the court explained: "Although the juror stated the cancellation of her vacation would not affect the discharge of her duties as a juror, her behavior and demeanor supplied substantial evidence to the contrary.  She had repeatedly brought the problem of the vacation to the court's attention, exhibiting concern and agitation over it. The court determined that the juror's demeanor indicated her ability to deliberate fairly would be substantially impaired if the penalty trial caused her to cancel her vacation. [Citation.] We also observe that the juror would have felt some pressure to bring the penalty deliberations to a speedy close in order to preserve her planned vacation."  (Id. at p. 489.)

Similarly, in Fudge, supra, 7 Cal.4th 1075, our Supreme Court upheld the discharge of a juror during guilt phase deliberations of a capital murder trial where the juror anticipated starting a new job and experienced anxiety over certain paperwork she needed to complete to terminate her old position.   (Id. at pp. 1099-1100.) Shortly after deliberations began, the juror sent the trial court a note indicating that the impending start date of her new job would make deliberations inconvenient and might impact her decision. But when the trial court questioned her, she stated that her anxiety over the new job would not affect her deliberations. The trial court decided not to discharge her from the jury.  (Id. at p. 1098.)  Later in the deliberations, after the juror again asked to be removed, the trial court again questioned her, and she reaffirmed that her anxiety would not affect her deliberations.  (Ibid.)  The trial court then allowed her to call her employer, who informed her that she would be required to complete certain paperwork in order to terminate her old position.  (Id. at pp. 1098-1099.)  After the phone call, she stated that her anxiety over this paperwork would affect her deliberations, and the trial court removed her.  Our Supreme Court found no abuse of discretion. (Id. at pp. 1099-1100; see also Earp, supra, 20 Cal.4th at p. 893 [upholding trial court's decision to discharge juror where the juror's "employer had stopped paying her for jury service one month earlier and she had used her own vacation time during the month to continue to serve on the jury"].)

We find no abuse of discretion in this case.  As a preliminary matter, the trial court properly called Juror No. 6 and Juror No. 12 in for questioning after being informed by the foreperson that these jurors were attempting to "rush through" the deliberations and were not "taking their obligation seriously." [Citation.]  With respect to Juror No. 6, the foreperson stated that he complained about not being paid for his jury service. With respect to Juror No. 12, the foreperson stated that she "seem[ed] to be in a hurry and wanting to get this trial over with," and repeated several times that she was staying up late correcting paperwork for her students. These reports

raised the possibility that these jurors had either a financial or personal hardship that might cause them to feel pressure to bring deliberations to a speedy close, which would render them unable to perform their duty as jurors. [Citations.]

*Removal of Juror No. 6*

The trial court's decision to remove Juror No. 6 was not an abuse of discretion. This juror unequivocally stated that he would not be able to put aside his concern about not being paid and focus on the evidence. This statement, relied upon by the trial court, constitutes substantial evidence that Juror No. 6 was unable to perform his duty as a juror, and thus establishes good cause for removal as a "demonstrable reality." (People v. Wilson (2008) 43 Cal.4th 1, 26 ["The demonstrable reality test 'requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that [disqualification] was established' "].)

Nevertheless, defendant argues that the trial court inappropriately continued to question Juror No. 6 after he assured the court "that although the situation was 'inconvenient,' he was still able to fulfill his duties as a juror, and would be able to do so even if the deliberations took another week." Not so. As defendant acknowledges, the trial court's inquiry into possible grounds for removal of a juror "should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (People v. Cleveland, supra, 25 Cal.4th at p. 485[.])

Here, as in Lucas, although the juror expressed an ability to continue deliberations ("I guess I can do it"), he also clenched his jaw at the prospect of continued deliberations, which the trial court noted for the record. Then, he could not "truthfully" state that he would be able to continue to deliberate without thinking that he wanted to " 'hurry and get this over with.' " Based on Juror No. 6's demeanor and inability to promise to deliberate without wanting to bring deliberations to a speedy close, the trial court appropriately continued the inquiry. This, combined with his later unequivocal statement that he would not be able to put aside his concern about not being paid and focus on the evidence, supports the trial court's decision to remove him from the jury.

*Removal of Juror No. 12*

We also conclude that the trial court did not abuse its discretion by removing Juror No. 12 from the jury. Much like the juror in Fudge, supra, 7 Cal.4th 1075, 1099-1100, Juror No. 12 initially stated that she was committed to participating in deliberations despite the fact that she was staying up late correcting papers and

getting up early to return them to the high school.  Satisfied by this response, the trial court decided not to remove her from the jury.  However, the situation changed when she discovered that her current substitute teacher would no longer be available.  After leaving a voicemail asking to be removed, the trial court again called her in for questioning. This time, after some initial equivocal responses ("of course [she] could" concentrate on the evidence and participate in deliberations, but it would cause her "a lot of stress and pressure" and "would be very, very difficult") and further questioning, she unequivocally stated that she would not be able to concentrate and deliberate as a juror.  She then broke into tears.  We conclude that Juror No. 12's demeanor and unequivocal statement that she would not be able to concentrate and deliberate as a juror established good cause for removal as a demonstrable reality.

Nevertheless, defendant complains that the trial court "'kind of laid out two paths and after laying out the two paths, she then took the path of being excused,'" referring to this statement: "[I]f you say, 'It's going to be difficult, but I will do it,' then my obligation under the law is to leave you on this jury. If you say, 'I am not a quitter. I know it's going to be difficult, but given the situation, I'm not going to be able to concentrate. I am going to be thinking about when it's going to be over because of the duty I have to my students,' then the law would provide differently."  Contrary to defendant's argument, we do not believe that this statement amounted to the trial court putting words into the juror's mouth.  The juror's previous answers were subject to two interpretations, and the trial court simply asked her to clearly state which one she meant.  In any event, even if she had stuck to her initial position that she would be able to continue to participate in deliberations, the trial court would have been justified in removing her based on her "demeanor and distress" displayed when she broke down during questioning. (See Lucas, supra, 12 Cal.4th at p. 488.)

Finally, defendant's reliance on People v. Delamora (1996) 48 Cal.App.4th 1850 (Delamora ) is misplaced. There, the Court of Appeal found an abuse of discretion where the trial court removed two jurors after more than three days of deliberation "without any inquiry" about whether they would be willing to deliberate longer even if their employers would not pay them.  (Id. at p. 1855.) The court noted, "[a]lthough a trial court does not abuse its discretion when it discharges a juror because of problems related to the juror's employment, the employment problem must be real and not imagined," and explained, "where, as here, there is no evidence at all to show good cause (because no inquiry of any kind was made), the procedure used was by definition inadequate." (Id. at pp. 1855-1856.)  Unlike Delamora, the trial court in this case extensively questioned both Juror No. 6 and Juror No. 12 concerning the perceived hardship. These jurors were not removed until the trial court was convinced that such a hardship existed.

14

We conclude with respect to both jurors that the hardship was not imagined, but was instead shown to be a demonstrable reality.

2011 WL 2571312, **5-8 (some internal citations omitted).

3.  <u>Discussion</u>

State criminal defendants have a federal constitutional right to a fair and impartial jury.  <u>Duncan v. Louisiana</u>, 391 U.S. 145, 149 (1968).  A defendant's Sixth Amendment right to a fair trial is violated when the "essential feature" of the jury is not preserved.  <u>Williams v. Florida</u>, 399 U.S. 78, 100 (1970).  California Penal Code section 1089 governs the dismissal and substitution of jurors in California criminal trials.  Under section 1089, a juror may be removed from service either before or after final submission of the case if the juror becomes ill, dies, or upon other "good cause."  <u>Id</u>.  The Ninth Circuit has upheld the constitutionality of section 1089, after determining that it "preserved the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments."  <u>Miller v. Stagner</u>, 757 F.2d 988, 995 (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985).  Accordingly, reviewing habeas courts need only decide whether the state court's application under the circumstances violated a petitioner's Sixth Amendment rights (e.g., whether good cause existed for the dismissal of the juror).  <u>Perez v. Marshall</u>, 119 F.3d 1422, 1426–28 (9th Cir.1997).

Section 1089 provides in pertinent part:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall than take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

Cal. Penal Code § 1089.

Under AEDPA, a state court's factual determination that good cause existed for the dismissal of a particular juror is presumed correct, and must be upheld unless the finding was

based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(2), (e)(1); <u>Perez</u>, 119 F.3d at 1426.[8]

Here, the state court of appeal's finding that good cause existed to remove Juror No. 6 was not an unreasonable determination of the facts.  The record reflects that Juror No. 6 initially expressed some doubt as to whether he could deliberate on the evidence without thinking about when the trial would be over.  Upon further questioning, he unequivocally responded "No" when asked whether he could focus on the evidence, regardless of how long jury deliberations lasted.  He also indicated that he could not "put aside" his concerns about the length of the trial and the resulting financial hardship.  The trial judge's extended questioning of Juror No. 6 on the topic of whether he could focus on his duties was not improper under established federal law.

The state court of appeal's finding that good cause existed to remove Juror No. 12 was also a reasonable determination of the facts.  Like Juror No. 6, this juror clearly indicated that she could not focus on deliberations without being distracted by the fact that her duties as a juror were causing personal hardship.  In response to the trial court's proper questioning on this subject, Juror No. 12 stated that it would be "very, very difficult" to concentrate on the evidence and engage in deliberations with other jurors.

Because the state court of appeal's "good cause" determinations as to both jurors were reasonable determinations of the facts under § 2254(d)(2), petitioner is not entitled to habeas relief on this claim.

////

////

---

[8] Per <u>Johnson</u> and for the reasons as discussed therein concerning a similar claim, the undersigned applies the presumption of a merits determination to this claim.  <u>See</u> 568 U.S. ___, slip. op. at 15 ("Indeed, it is difficult to imagine any panel of appellate judges reading <u>Cleveland</u> and passing on the propriety of dismissing a holdout juror under § 1089 without realizing that such situations also bear on the federal constitutional right to a fair trial.") Thus AEDPA deference to the state court's decision is proper.

B. <u>Jury Coercion</u>

1. <u>Claim</u>

Petitioner next claims that "the trial court's failure to respond to the jury's announcement that it was deadlocked, combined with the court's statements to Jurors No. 6 and 12, implicitly coerced the jury to reach verdicts." (Ptn. at 31.)

The state court of appeal addressed petitioner's claim as follows:

Defendant also asserts that his constitutional right to due process was violated when the trial court "effectively coerced the jury into reaching verdicts." Specifically, he asserts that the trial court failed to address the jury's indication of deadlock, removed a defense-oriented juror, failed to remind the jurors to stick to their conscientiously-held opinions, and informed the jurors brought in for questioning that they would be required to deliberate regardless of how long it took to render a verdict. Together, argues defendant, these "statements and actions implicitly told the jury that it must reach a verdict."

As we have already indicated, following the jury's indication of deadlock, the trial court asked the jury for the number of votes taken, the time of the last vote, and the numerical breakdown. The jury responded that it had taken a single vote that morning, and that the numerical breakdown was six-five-one as to each count. At this point, the trial court was required to investigate the hardships addressed in the previous section of this opinion.

After removing and replacing Juror No. 6, the trial court instructed the jury that deliberations must begin anew because the alternate juror "must participate fully in the deliberations that lead to any verdict" and both "[t]he People and the defendant have the right to a verdict reached only after full participation of the jurors whose votes determine that verdict." The trial court further explained: "Therefore, you must set aside and disregard all past deliberations and begin your deliberations all over again. Each of you must disregard the earlier deliberations and decide this case as if those earlier deliberations had not taken place." Defense counsel did not object to this instruction, nor request that the trial court address the jury's prior indication of deadlock. Then, after removing and replacing Juror No. 12, the trial court again instructed the jury to begin deliberations anew. Defense counsel again did not object to this approach. Nor did counsel ask the trial court to address the previous indication of deadlock.

Because defendant did not object to the trial court's approach with respect to instructing the jury following the removal of Juror No. 6 and Juror No. 12, he has forfeited his claim that it implicitly

17

coerced a verdict. (People v. Lewis and Oliver (2006) 39 Cal.4th 970, 1038.)  And while he did object to the removal of these jurors, we have already held that these jurors were properly removed.

In any event, no impropriety occurred. Section 1140 provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." "The determination whether there is reasonable probability of agreement rests in the discretion of the trial court. [Citations.]  The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' [Citation.]" (People v. Breaux (1991) 1 Cal.4th 281, 319.) "The question of coercion is necessarily dependent on the facts and circumstances of each case." (People v. Sandoval (1992) 4 Cal.4th 155, 195-196.)

Here, when the jury indicated deadlock, the trial court appropriately inquired about the number of votes taken and the numerical breakdown. (See People v. Carter (1968) 68 Cal.2d 810, 815.) Upon discovering that a single vote had been taken after a relatively short period of deliberation, the trial court was justified in requiring the jury to continue deliberating. (See People v. Rodriguez (1986) 42 Cal.3d 730, 774-777 [finding no abuse of discretion in requiring the jury to continue deliberating after it indicated deadlock after 18 days of deliberation].)  However, the trial court also discovered that two jurors were suffering hardships that required their removal from the jury, and properly instructed the jury to start their deliberations from the beginning. (People v. Collins (1976) 17 Cal.3d 687, 693-694, overruled on other grounds in People v. Boyette (2002) 29 Cal.4th 381, 462, fn. 19.)  This instruction in no way indicated that the trial court would refuse to release the jury until verdicts were reached.

Moreover, because the jury was starting its deliberations anew, there was no need to address the prior indication of deadlock.  Nor do we believe that the trial court's questions to Juror No. 6 and Juror No. 12 indicated that the trial court intended to require the jury to deliberate until it reached a verdict.  Instead, the trial court candidly acknowledged that it did not know how long deliberations would last, and simply sought to find out whether jurors' personal situations would allow them to focus on the evidence and participate in deliberations regardless of how long they lasted. Because deliberations can end in a deadlock as well as a verdict, this statement cannot be construed as informing the jurors that they would be required to deliberate until they rendered a unanimous verdict.

18

1    2011 WL 2571312, **8-9.

2    2. Discussion

3    As set forth above, before turning to the merits of petitioner's claim, the court of

4    appeal stated: "Because defendant did not object to the trial court's approach with respect to

5    instructing the jury following the removal of Juror No. 6 and Juror No. 12, he has forfeited his

6    claim that it implicitly coerced a verdict." Id. at *9, citing People v. Lewis and Oliver, 39 Cal.4th

7    970, 1038 (2006) (holding that, because defendants did not object to trial court's comments to

8    jury regarding scheduling, "they have forfeited their state law claim that it interfered with the

9    jury's deliberations and coerced a verdict. [Citation.]  They have also forfeited their related

10   constitutional claims. [Citation.]").

11   Respondent argues that this claim is procedurally barred.  Based on concerns of

12   comity and federalism, federal courts will not review a habeas petitioner's claims if the state

13   court decision denying relief relies on a state law ground that is independent of federal law and

14   adequate to support the judgment.  See Coleman v. Thompson, 501 U.S. 722 (1991); Harris v.

15   Reed, 489 U.S. 255, 260–62 (1989).  However, a discretionary state rule is not adequate to bar

16   federal habeas corpus review.  See Siripongs v. Calderon, 35 F.3d 1308 (9th Cir. 1994).

17   Generally, the only state law grounds meeting these requirements are state procedural rules.

18   Even if there is an independent and adequate state ground for the decision, the federal court may

19   still consider the claim if the petitioner can demonstrate: (1) cause for the default and actual

20   prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of

21   justice.  See Harris, 489 U.S. at 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)).

22   In the instant case, the last reasoned state court decision concluded that petitioner

23   forfeited his jury coercion claim by failing to object at trial.  Under California law, "[a]n

24   appellate court will not consider claims of error that could have been — but were not — raised in

25   the trial court."  People v. Vera, 15 Cal.4th 269, 275–76 (1997).  In Rich v. Calderon, 187 F.3d

26   1064, 1066 (9th Cir. 1999) and Vansickel v. White, 166 F.3d 953 (9th Cir. 1997), the Ninth

19

1  Circuit held that California's contemporaneous objection rule is an adequate and independent

2  state procedural rule when properly invoked by the state courts.  The Ninth Circuit has also

3  concluded that the contemporaneous objection rule has been consistently applied by the

4  California courts.  See Fairbanks v. Ayers, 650 F.3d 1243, 1256 (9th Cir. 2011);  Melendez v.

5  Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).

6          Here, while the court of appeal invoked the contemporaneous objection rule in

7  declaring petitioner's claim forfeited, it went on to alternately consider petitioner's claim on the

8  merits.  In the Ninth Circuit, it is a "well-settled rule that 'the independent state grounds doctrine

9  bars the federal courts from reconsidering the issue in the context of habeas corpus review as

10  long as the state court explicitly invokes a state procedural bar rule as a separate basis for its

11  decision.'"  Fairbank v. Ayers, 650 F.3d 1243, 1256 (9th Cir. 2011), citing Jackson v. Giurbino,

12  364 F.3d 1002, 1006 (9th Cir. 2004).  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A]

13  state court need not fear reaching the merits of a federal claim in an *alternative* holding.  By its

14  very definition, the adequate and independent state ground doctrine requires the federal court to

15  honor a state holding that is a sufficient basis for the state court's judgment, even when the state

16  court also relies on federal law.")  (Italics in original.)

17          Petitioner has not demonstrated cause and prejudice or a fundamental miscarriage

18  of justice such as would allow the court to consider this procedurally defaulted claim.[9]  As a

19  result, the court concludes that this claim is barred.

20  \\\\\

21  \\\\\

22
_____

23  [9] "Any criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of
    that body." Lowenfield v. Phelps, 484 U.S. 231, 241 (1988).  Clearly established Supreme Court

24  law on the subject of jury coercion in the constitutional context is sparse, consisting solely of
    Lowenfield.  See Wong v. Smith, ⎯⎯ U.S. ⎯⎯, 131 S.Ct. 10, 11 (2011) (Alito, J., dissenting

25  from the denial of certiorari ).  "As a result, the clearly established law in this area provides very
    little specific guidance."  Id.  "About all that can be said is that coercive instructions are

26  unconstitutional, coerciveness must be judged on the totality of the circumstances, and the facts
    of Lowenfield . . . were not unconstitutionally coercive."  Id.

C.  Statement to Police

1.  Claim

Petitioner claims that the trial court violated his Fifth and Fourteenth Amendment rights when it refused to suppress his statements to the police.  (Ptn. at 37.)  He maintains that "police questioning should have ceased when he stated, 'I'll get a lawyer.  I don't know what you're talking about.  Honest-to-God I don't know' and 'I'll go to trial, fight it all the way out.'" (Id.)

The state court of appeal set forth the relevant facts as follows:

*Police Interrogation*

Defendant was arrested and interrogated by police in June 2006. At the start of the interrogation, defendant was advised of his right to remain silent, to have an attorney present during questioning, and to have such an attorney appointed if he could not afford to retain counsel.  (Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694] (Miranda).)  Defendant acknowledged that he understood these rights and began answering questions.

At first, defendant claimed to "know nothing" about the home invasion robbery that occurred in September 2003.  Defendant admitted to knowing C.T., claiming to be "good friends" with him. However, he denied knowing J.W., stating that he saw her only once while he and C.T. were drinking and shooting dice at C.T.'s apartment.  When detectives asked whether he had ever had sex with J.W., defendant responded: "Hell, no."  One of the detectives then asked defendant if he knew why she would pick him out of a lineup and accuse him of being one of three individuals who broke into her home and robbed her.  Defendant responded: "No. I only seen her one time and-and can't call it. I-anything ya'll need from me. Ya'll can get it from me. Prove it wasn't me."

The detectives then confronted defendant with the details of the crimes: "[J.W.] says that three guys, one of them being you, forced their way into their apartment" and "two of the guys robbed her and you raped her."  Defendant called this a "crazy-assed story."  The detectives continued: "But she picked you right out of the lineup" and "said she'll never forget your eyes even though you had a mask on, that covered your nose and mouth."  They also explained that J.W. had stated that defendant was carrying a handgun during the robbery and "pistol-whipped her with it."  Detectives then told defendant that his DNA matched that collected from semen found the night of the assault.  Defendant repeatedly denied involvement. As an explanation for his semen being found at the crime scene,

21

defendant stated: "Man, me being a young man, only part of being a player, living the fast life out there, man, you fuck broads every day."

One of the detectives then told defendant that he would be charged with rape and home invasion robbery.  Defendant responded: "I'll get a lawyer. I don't know what you're talking about. Honest-to-God I don't know."  The detective continued: "Now is the time to tell us what happened."  Defendant answered: "I don't know what you're talking about so ain't no time to tell nothing, because I don't want-don't know nothing."  The detective interrupted with: "You had nothing to do with it?"  Defendant responded: "I'll go to trial, fight it all the way out. I'll win-because I had nothing to do with that. I don't know nothing, so I don't know what you guys talking about."

Questioning continued.  And defendant steadfastly denied involvement in the crimes, stating at one point: "I don't know what you're talking about. That wasn't me. I didn't do it. Shh. So you guys say I'm-you guys say I'm responsible for something I don't know nothing about. Hey, I guess I got to fight it in court. Sorry. If that's what you guys say, that's what you guys say. I'm-I'm denying it, because I didn't do it."  At another point, defendant stated: "I didn't do it, period, point blank. We can go to court, or we can go to trial." Detectives then took a saliva sample from defendant, stopped the interrogation, and left the room.

A short time later, defendant knocked on the interrogation room door and told another detective that he wanted to talk to his previous interrogators, stating: "I want to tell them the truth." Defendant then admitted to having sex with J.W., but claimed that the sex was consensual. According to defendant, he met J.W. at the mini-mart and then went back to her apartment to smoke marijuana.  After smoking the marijuana, they had sex in J.W.'s bedroom, at which point three men broke into the apartment.  The men punched and kicked defendant in the face and one of them chased defendant out of the apartment.  Defendant also claimed that he did not know J.W. prior to meeting her at the mini-mart, and never saw her again after being chased out of her apartment.

2011 WL 2571312, **10-11.

2. <u>State Court Decision</u>

      Addressing the merits of petitioner's federal claim, the state court of appeal reasoned:

      Nor did the trial court violate defendant's constitutional rights by admitting his statement to police into evidence. Contrary to defendant's argument on appeal, he did not unambiguously invoke

his right to counsel, and thus the police were not required to stop the interrogation.

. . .

Defendant argues that the detectives should have stopped the interrogation after he stated: "I'll get a lawyer. I don't know what you're talking about. Honest-to-God I don't know." According to defendant, this was an unambiguous invocation of his right to have an attorney present during questioning. We disagree.

"To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a custodial interrogation must first be advised of his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent." (People v. Stitely (2005) 35 Cal.4th 514, 535, citing Miranda, supra, 384 U.S. at pp. 444, 467-473, 478-479 [16 L.Ed.2d at pp. 706-707, 719-723, 726].) "If at any point in the interview the suspect invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' [Citation.] But, as the high court has stated, an officer is not required to stop questioning a suspect when 'a suspect makes a reference to an attorney that is ambiguous or equivocal.' [Citation.] The suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " (People v. Bacon (2010) 50 Cal.4th 1082, 1105, quoting Davis v. United States (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 371].)

In People v. Davis (2009) 46 Cal.4th 539 (Davis), defendant was interrogated concerning the kidnapping and murder of 12-year-old Polly Klaas. After about an hour of questioning, the interrogators, Officer Pelton and FBI Agent Taylor, accused defendant of abducting the girl and alluded to certain trace evidence and DNA evidence. Defendant stood up and responded: " 'Well then book me and let's get a lawyer and let's go for it, you know.' " (Id. at pp. 550, 586-587.) Defendant then stated that he resented being accused of the abduction and remarked, " 'let's shit or get off the pot.' " (Id. at p. 587.) Agent Taylor then stated, " 'It's going to happen,' " prompting defendant to respond: " 'Well, let's go for it. That's the end, the end.' " Defendant was then asked whether he still wanted to talk, to which he replied: " 'Get real. You think I should?' " Officer Pelton answered: " 'That's up to you.' " Defendant responded: " 'Fuck.' " He then sat down and continued to answer questions.

Our Supreme Court held that these comments "were not an unambiguous invocation of the right to 'immediate presence of an attorney.' " (Davis, supra, 46 Cal.4th at p. 588, quoting People v. Gonzalez (2005) 34 Cal.4th 1111, 1126.) Instead, the court considered defendant's statement (" 'book me and let's get a lawyer

and let's go for it' ") to be a challenge to his interrogators, which he employed as an interrogation technique, and not as a means of invoking the right to have an attorney present during questioning. (Ibid.)  The court also contrasted this ambiguous statement with a statement made later in the interrogation, in which "defendant blurted out, 'get me a lawyer,' and said he was 'over and done' answering any questions." (Ibid.)  Unlike the first statement, this latter statement was a "clear invocation of his constitutional rights to counsel and to remain silent," and the interrogation was properly ended at that point.  (Ibid.; compare People v. Jablonski (2006) 37 Cal.4th 774, 810-811 [" 'I won't say anything until I see my lawyer' " is an unambiguous request for the immediate presence of an attorney] with People v. Gonzalez, supra, 34 Cal.4th at pp. 1119, 1126 [" 'if for anything you guys are going to charge me I want to talk to a public defender' " is not an unambiguous request for the immediate presence of an attorney].)

In this case, after detectives confronted defendant with the details of the crimes, explained that semen containing his DNA was found at the crime scene, and told him that he would be charged with rape and home invasion robbery, defendant stated: "I'll get a lawyer." Like the statement in Davis, this statement was not an unambiguous request for the immediate presence of an attorney before defendant would answer any more questions.  It was a challenge.  Defendant was telling the detectives that if he were charged with these crimes, he would get a lawyer to defend against them at trial.  Indeed, within seconds of making the statement, defendant stated: "I'll go to trial, fight it all the way out. I'll win-because I had nothing to do with that."  And while he repeated the challenge twice more ("I guess I got to fight it in court" and "we can go to trial"), at no point did defendant request the immediate presence of an attorney.

We conclude defendant did not unambiguously invoke his right to have an attorney present during questioning. Therefore, the detectives were not required to stop the interrogation and defendant's entire statement to police was properly admitted into evidence.

2011 WL 2571312, **11-12.

3. <u>Discussion</u>

In <u>Miranda</u>, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.  To this end, custodial interrogation must be

1   preceded by advice to the potential defendant that he or she has the right to consult with a lawyer,

2   the right to remain silent and that anything stated can be used in evidence against him or her.  Id.

3   at 473–74.  These procedural requirements are designed "to protect people against the coercive

4   nature of custodial interrogations."  DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

5   Once Miranda warnings have been given, if a suspect makes a clear and unambiguous statement

6   invoking his constitutional rights, "all questioning must cease."  Smith v. Illinois, 469 U.S. 91,

7   98, (1984).

8          A defendant may waive his Miranda rights, provided the waiver is "voluntary in

9   the sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

10  or deception," and "made with a full awareness of both the nature of the right being abandoned

11  and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421

12  (1986).  However, an express waiver of Miranda rights is not necessary.  Berghuis v. Thompkins,

13  ⸺ U.S. ⸺, ⸺, 130 S.Ct. 2250, 2261 (2010); North Carolina v. Butler, 441 U.S. 369, 37

14  (1979); United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005) ("In soliciting a waiver of

15  Miranda rights, police officers need not use a waiver form nor ask explicitly whether a defendant

16  intends to waive his or her rights.").  A valid waiver of rights may be implied under the

17  circumstances presented in the particular case.  Specifically, "a suspect may impliedly waive the

18  rights by answering an officer's questions after receiving Miranda warnings."  United States v.

19  Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008) (quoting United States v. Rodriguez–Preciado,

20  399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005)).  See also Butler, 441 U.S. at

21  369–73 (waiver of Miranda rights can be inferred "from the actions and words of the person

22  interrogated").

23          Here, the state court's determination that the trial court did not violate plaintiff's

24  right to due process by admitting his statements to police is reasonable under clearly established

25  federal law.  Taken in context, petitioner's statement, "I'll get a lawyer," was not a "a clear and

26  unambiguous statement invoking his constitutional rights."  See Smith, 496 U.S. at 98.  Rather

than indicating a desire to have an attorney present during the interview, this statement

reasonably could be understood to mean that petitioner would dispute, with the aid of lawyer, any

charges the state filed against him.  Nor do petitioner's subsequent statements – e.g., "I don't

know what you're talking about" – constitute a clear request for an attorney, requiring police to

terminate the interview.  Thus petitioner is not entitled to federal habeas relief on this claim.

D.  Jury Instructions

1.  Claim

Petitioner claims that "the trial court erred by failing to instruct the jury on the

specific intent necessary for attempted sodomy . . . and assault with the intent to commit

sodomy."  (Ptn. at 40.)

The state court of appeal set forth the relevant facts as follows:

> *Trial Court's Jury Instructions*
>
> The trial court instructed the jury on the crime of attempted sodomy with CALCRIM No. 460. FN3  This instruction begins: "To prove that the defendant is guilty of attempted sodomy, the People must prove that: [] 1. The defendant took a direct but ineffective step toward committing sodomy; and [] 2. The defendant intended to commit sodomy."  Then, after defining "direct step," including the fact that such a step "indicates a definite and unambiguous intent to commit sodomy," the instruction explains: "To decide whether the defendant intended to commit sodomy, please refer to the separate instructions that I will give you on that crime."
>
> FN3. CALCRIM No. 460, as delivered to the jury, provides in full: "To prove that the defendant is guilty of attempted sodomy, the People must prove that: [] 1. The defendant took a direct but ineffective step toward committing sodomy; and [] 2. The defendant intended to commit sodomy." [] 'A direct step' requires more than mere planning or preparing to commit sodomy or obtaining or arranging for something needed to commit sodomy.  A direct step is one that goes beyond planning or preparation and shows that a person is putting his plan into action.  A direct step indicates a definite and unambiguous intent to commit sodomy.  It is a direct movement towards the commission of the crime after preparations are made.  It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.  [] A person who attempts to commit sodomy is guilty of attempted

sodomy even if, after taking a direct step toward committing the crime, he abandoned further efforts to complete the crime or if his attempt failed or was interrupted by someone or something beyond his control.  On the other hand, if a person freely and voluntarily abandons his plans before taking a direct step toward committing sodomy, then that person is not guilty of attempted sodomy.  [] To decide whether the defendant intended to commit sodomy, please refer to the separate instructions that I will give you on that crime."

The trial court instructed the jury on the crime of assault with intent to commit sodomy with CALCRIM No. 890. FN4  This instruction begins: "To prove that the defendant is guilty of [assault with intent to commit sodomy], the People must prove that: [] 1. The defendant did an act that by its nature would directly and probably result in the application of force to a person; [] 2. The defendant did that acts willfully; [] 3. When the defendant acted, he was aware of the facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [] 4. When the defendant acted, he had the present ability to apply force to a person; and [] 5. When the defendant acted, he intended to commit sodomy."  Then, after defining "willfully," "application of force," and "apply force," the instruction explains: "To decide whether the defendant intended to commit sodomy, please refer to the earlier definition of sodomy."

FN4. CALCRIM No. 890, as delivered to the jury, provides in full: "To prove that the defendant is guilty of [assault with intent to commit sodomy], the People must prove that: [] 1. The defendant did an act that by its nature would directly and probably result in the application of force to a person; [] 2. The defendant did that act willfully; [] 3. When the defendant acted, he was aware of the facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [] 4. When the defendant acted, he had the present ability to apply force to a person; and [] 5. When the defendant acted, he intended to commit sodomy. [] Someone commits an act 'willfully' when he does it willingly or on purpose. [] The terms 'application of force' and 'apply force' mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. [] The touching can be done indirectly by causing an object to touch the other person. [] The People are not required to prove the defendant actually touched someone. [] No one needs to actually have been injured by the defendant's act.  But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault and, if so, what kind of assault it was. [] To decide whether the defendant intended to commit sodomy, please refer to the earlier definition of sodomy."

Between these instructions, the trial court instructed the jury on the crime of sodomy with CALCRIM No. 1030. This instruction begins: "The crime of sodomy by force or fear has the following elements: [] 1. A male person committed an act of sodomy with another person; [] 2. The other person did not consent to the act; and [] 3. The male person accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to someone."

The instruction then further defines each element: "Sodomy is any penetration, no matter how slight, of the anus of one person by the penis of another person.  Ejaculation is not required. [] In order to consent, a person must act freely and voluntarily and know the nature of the act. []  An act is accomplished by force if a person uses enough physical force to overcome the other person's will. [] 'Duress' means a direct or implied threat of force, violence, or danger that causes a reasonable person to do or submit to something that she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant. []  'Menace' means a threat, statement or act showing an intent to injure someone. []  An act is accomplished by fear if the other person is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it."

Finally, the instruction explains: "The male person is not guilty of forcible sodomy or attempted sodomy if he actually and reasonably believed that the other person consented to the act. []  The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the other person consented. If the People have not met this burden, you must find the defendant not guilty."

The trial court further instructed the jury that the crime of sodomy required a "general criminal intent," while the crimes of attempted sodomy and assault with intent to commit sodomy required a "specific intent" that was explained in the instructions for those crimes.

2011 WL 2571312, **13-14.

2. <u>State Court Decision</u>

The state court of appeal addressed petitioner's claim as follows:

Defendant argues that the foregoing instructions failed to adequately inform the jury on the specific intent necessary for the crimes of attempted sodomy and assault with intent to commit sodomy because these crimes require not only the specific intent to commit the underlying sex act, but also the specific intent to do so

28

without the victim's consent.  While defendant is correct in his description of the specific intent required (see People v. Davis (1995) 10 Cal.4th 463, 509 [an " 'essential element' " of assault with intent to commit sodomy is " 'the intent to commit the act against the will of the complainant' "] ), we conclude that the instructions as a whole properly informed the jury of the required specific intent.  "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from [one] particular instruction." (People v. Burgener (1986) 41 Cal.3d 505, 538, overruled on other grounds in People v. Reyes (1998) 19 Cal.4th 743, 753.)

Here, the attempted sodomy instruction (CALCRIM No. 460) explained: "To decide whether the defendant intended to commit sodomy, please refer to the separate instructions that I will give you on that crime."  Then, the sodomy instruction (CALCRIM No. 1030) defined the "crime" of sodomy as requiring three elements: (1) a male person committed an act of sodomy with another person; (2) the other person did not consent to the act; and (3) the male person accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to someone. Then, the assault with intent to commit sodomy instruction (CALCRIM No. 890) also referred the jury to "the earlier definition of sodomy" in deciding whether defendant intended to commit sodomy. Thus, the jury would reasonably have understood that in order for defendant to have committed the crimes of attempted sodomy and assault with intent to commit sodomy, he would have to intend not only to commit an act of sodomy, but also to intend to do so without the victim's consent. (See People v. Dillon (2009) 174 Cal.App.4th 1367, 1378-1379.)

Defendant cannot be heard to complain about jury instructions that accurately set forth the law with respect to the elements of sodomy, attempted sodomy, and assault with intent to commit sodomy.

2011 WL 2571312, *14.

3.  Discussion

       "[F]ederal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67 (1991).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68.  To obtain federal habeas relief for instructional error, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See id. at 72.  The instruction may not be judged in artificial isolation, but must be

considered in the context of the instructions as a whole and the trial record.  See id.  In reviewing

a faulty instruction, the court inquires whether there is a "reasonable likelihood" that the jury has

applied the challenged instruction in a way that violates the Constitution.  Id. at 72, n. 4.

The omission of an instruction is less likely to be prejudicial than a misstatement

of the law.  See Walker v. Endell, 850 F.2d 470, 475–76 (9th Cir. 1987) (citing Henderson v.

Kibbe, 431 U.S. 145, 155 (1977)).  Thus, a habeas petitioner whose claim involves a failure to

give a particular instruction bears an " 'especially heavy burden.' "  Villafuerte v. Stewart, 111

F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).

Even if there is an instructional error, a habeas petitioner is not entitled to relief

unless the error  "'had substantial and injurious effect or influence in determining the jury's

verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  In other words, state prisoners

seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but

are not entitled to habeas relief unless the error resulted in "actual prejudice."  Id. (citation

omitted).  If the court is convinced that the error did not influence the jury, or had but very slight

effect, the verdict and the judgment should stand.  O'Neal v. McAninch, 513 U.S. 432, 437

(1995).  Further, a federal court's review of a claim of instructional error is subject to a highly

deferential standard of review.  Masoner v. Thurman, 996 F.2d 1003, 1006 (9th Cir.1993).

Here, the undersigned finds no basis for disturbing the conclusions of the state

appellate court.  Even assuming the trial court erred in failing to instruct on the specific intent

requirement for attempted sodomy and/or assault with intent to commit sodomy, any such an

error was harmless in light of the extensive evidence present in the record to warrant petitioner's

conviction on these counts.  What petitioner characterizes as instructional error did not "so

infect[ ] the entire trial that the resulting conviction violate[d] due process."  See Estelle, 502

U.S. at 72.  Therefore, petitioner is not entitled to relief on this claim.

\\\\\

\\\\\

1        Accordingly, IT IS HEREBY ORDERED THAT:

2        1.  The petition for writ of habeas corpus (Dkt. No. 1) is denied; and

3        2.  This case is closed.

4    Dated: March 25, 2013

5

6                                                CAROLYN K. DELANEY
                                                 UNITED STATES MAGISTRATE JUDGE

7    2belt3365.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26